Filed 4/24/26  Taft Union High School Dist. v. City of Taft CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| TAFT UNION HIGH SCHOOL DISTRICT,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>CITY OF TAFT,<br><br>Defendant and Respondent. | F086931<br><br>(Super. Ct. No. S-1500-CV-28380)<br><br>**MODIFICATION OF OPINION ON DENIAL OF REHEARING (NO CHANGE IN JUDGMENT)** |

It is ordered that the opinion filed herein on April 3, 2026, be modified in the following particulars:

1.      On page 19, delete the last full paragraph that begins "We disagree with the District's assessment" and insert the following paragraph in its place:

> We disagree with the District's assessment of the relevance of Hallmark's post incident statements to the meaning of the Agreement and its requirements.  Generally, when a contract is written, "the intention of the parties is to be ascertained from the writing alone, if possible." (Civ. Code, § 1639.)  In addition, a "contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." (Civ. Code, § 1636.)  There is no evidence that Hallmark was involved in the negotiation of the Agreement.  Consequently, to the extent that Hallmark might have formed an

understanding of specific language in the Agreement, that understanding could not have reflected the parties' mutual intention when they signed it. In other words, any understanding Hallmark had of the Agreement's language could not have been disclosed or discussed during the process of negotiating and executing the Agreement. (*Cedars-Sinai Medical Center v. Shewry* (2006) 137 Cal.App.4th 964, 980 [" 'undisclosed intent or understanding is irrelevant to contract interpretation' "].) Thus, his statements do not have "any tendency in reason to prove or disprove" (§ 210) the mutual intention of the parties "at the time of contracting" (Civ. Code, § 1636).

2.      On page 20, delete the first sentence of the first full paragraph that begins "Furthermore, even if Hallmark had a detailed knowledge" and insert the following three sentences in its place:

> Furthermore, Hallmark testified at trial that he did not recognize the Agreement and that he had not seen it before being called to testify. He stated, contrary to Chief Whiting's testimony, that the chief did not give him a copy of the Agreement. Even if we assume Hallmark had received a copy and had a detailed knowledge of the Agreement's terms that reflected the parties' intentions, his statements did not directly reference the Agreement.

3.      At the top of page 38, immediately before "III. DUTY TO DEFEND THE CLEVELAND ACTION," insert the following new section II. C., Petition for Rehearing:

> C.    <u>Petition for Rehearing</u>
>
> District's petition for a rehearing cites Government Code section 68081 and asserts that because "neither party addressed the issue of the applicability of Evidence Code § 355 in their briefs and the court raised it on its own motion, a rehearing is mandatory." Government Code section 68081 provides in full:
>
>> "Before the Supreme Court, a court of appeal, or the appellate division of a superior court renders a decision in a proceeding other than a summary denial of a petition for an extraordinary writ, based upon an *issue* which

2.

was *not proposed* or *briefed* by any party to the proceeding, the court shall afford the parties an *opportunity* to present their views on the matter through supplemental briefing. If the court fails to afford that opportunity, a rehearing shall be ordered upon timely petition of any party." (Italics added.)

In *People v. Alice* (2007) 41 Cal.4th 668 (*Alice*), the Supreme Court explained the application of Government Code section 68081 and the meaning of the statutory terms italicized above:

> "[Government Code s]ection 68081 does not require that a party actually have briefed an issue; it requires only that the party had the opportunity to do so. By requiring the parties to file opening and responding briefs, the California Rules of Court automatically give the parties the opportunity to brief every issue that is raised in the appeal. (Cal. Rules of Court, rule 8.200(a)(1).) Further, we hold that this also gives the parties the opportunity to brief any issues that are fairly included within the issues actually raised." (*Alice*, *supra*, 41 Cal.4th at p. 677.)

The high court expanded its explanation of the meaning of Government Code section 68081 by stating:

> "The parties need only have been given an opportunity to brief the issue decided by the court, and the fact that a party does not address an issue, mode of analysis, or authority that is raised or fairly included within the issues raised does not implicate the protections of [Government Code] section 68081." (*Alice*, *supra*, 41 Cal.4th at p. 679.)

Consequently, we conclude an issue is "proposed" for purposes of Government Code section 68081 when it is fairly included or encompassed in the broader issues raised in the appeal. (E.g., *Church Mutual Ins. Co., S.I. v. GuideOne Specialty Mutual Ins. Co.* (2021) 72 Cal.App.5th 1042, 1055,

3.

fn. 2 [existence of agency relationship fairly encompassed in the main issue raised in the appeal about the nature of the relationship between the church and its constituent parts].) Here, a heading in District's opening brief asserted the trial court committed prejudicial error in allowing the introduction of the Cleveland verdict to show the District was found negligent. This broad argument about prejudicial error fairly includes the specific question of whether the claimed prejudice could have been avoided by a limiting instruction informing the jury how the Cleveland verdict could and could not be used in deciding the issues presented. Therefore, District had an opportunity to brief the issue and our discussion of section 355 and the use of a limiting instruction does not implicate the protections of Government Code section 68081. (See *Alice*, *supra*, 41 Cal.4th at p. 679.)

There is no change in the judgment. Appellant's petition for rehearing is denied.

LEVY, J.

WE CONCUR:


DETJEN, Acting P. J.


DE SANTOS, J.

Filed 4/3/26  Taft Union High School Dist. v. City of Taft CA5 (unmodified opinion)

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| TAFT UNION HIGH SCHOOL DISTRICT,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>CITY OF TAFT,<br><br>Defendant and Respondent. | F086931<br><br>(Super. Ct. No. S-1500-CV-28380)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  David R. Zulfa, Judge.

McCormick, Barstow, Sheppard, Wayte & Carruth, James P. Wagoner, Nicholas H. Rasmussen, Maria E. Valencia, and Ryan Franklin for Plaintiff and Appellant.

Marderosian & Cohen, Michael G. Marderosian and Heather S. Cohen, for Defendant and Respondent.

-ooOoo-

The Taft Union High School District (District) brought this indemnification action against the City of Taft (City) to be reimbursed for its payment of a judgment in a school shooting lawsuit (see *Cleveland v. Taft Union High School Dist.* (2022) 76 Cal.App.5th

776 [injured student's $2 million judgment against the District affirmed] (*Cleveland*))

and for its costs of defending that lawsuit. The District contends the City had a

contractual obligation to indemnify and a statutory duty to defend. (See Civ. Code,

§ 2778, subd. 4). The contract between the District and the City stated (1) the City would

provide the high school with one police officer for 40 hours per week and (2) each party

would indemnify the other for liability for injuries to any person *caused by* that party's

negligent or *wrongful conduct* in performing the contract. The District's theory of the

City's wrongful conduct and causation echoes the student's complaint, which alleged the

shooting would not have occurred had the police officer assigned to the high school

shown up for work that morning.

The District's claim for indemnification of the amount paid to satisfy the student's

judgment was presented to a jury. The jury found the City did not breach its contract

with the District. After the jury's verdict, the District's claim for damages for breach of

the duty to defend was decided by the trial court. The court concluded the City had no

duty to defend the District against the student's tort action. Judgment was entered for the

City and the District appealed.

First, on the indemnification claim, we conclude the trial court did not commit

reversible error (1) when it excluded evidence of the absent police officer's statements

that he felt guilt and responsibility for the shooting and that he should have been there or

(2) when it admitted evidence that the District was found liable for negligence by the jury

in the student's tort action. Accordingly, the District is not entitled to a new trial on its

claim for indemnity of the student's judgment.

Second, on the duty to defend claim, we conclude the City had a statutory duty to

defend the District and breached that duty. Based on Civil Code section 2778,

subdivision 4, as interpreted in *Crawford v. Weather Shield Mfg., Inc.* (2008) 44 Cal.4th

541 (*Crawford*) and other case law, the City's duty to defend arose when the District

tendered its defense of the student's tort action because the student's complaint alleged

2.

facts that, at least potentially, would give rise to a duty to indemnify. (*Id*. at p. 558; *City of Bell v. Superior Court* (2013) 220 Cal.App.4th 236, 251 (*Bell*).) The City's duty to defend was triggered long before the jury found the City had not breached its contract, and the City has provided no authority contradicting the established legal principle that a jury's finding does not *retroactively* extinguish the duty to defend. (*Centex Homes v. R-Help Construction, Co, Inc.* (2019) 32 Cal.App.5th 1230, 1238 (*Centex Homes*); see *Crawford*, at p. 558, fn. 7.) Accordingly, the District is entitled to a new trial on the issue of damages resulting from the City's failure to defend.

To the extent the City contends the broad duty to defend implied by statute into the contract is harsh for it and others similarly situated, the answer lies in the freedom of contract, which allows parties to alter the statutory rules. Pursuant to this freedom, the City could have negotiated an indemnity provision that explicitly eliminated or limited the duty to defend implied by Civil Code section 2778.

We therefore affirm the judgment in part and reverse it in part.

## FACTS

On August 20, 2012, the City and the District entered into an "Agreement for Law Enforcement Services" (Agreement) that remained in effect until June 5, 2013. Police Chief Edward W. Whiting (Chief Whiting) and city attorney David Prentice handled the City's side of the negotiations. Chief Whiting served as the City's chief of police from 2010 until he retired in March 2018. Craig Jones, the city manager, reviewed the Agreement and presented it to the city council for ratification. Jones testified the reason he reviewed it was to make sure the Agreement clearly reflected what was requested of the City's services by the District's superintendent.

A recital on the Agreement's first page stated: "THE CITY is willing to provide for one (1) Police Officer for forty (40) hours per week to intervene and counsel in DISTRICT'S Truancy Reduction Program and to provide a police presence on school facilities." The Agreement's first numbered paragraph stated: "The purpose of this

agreement is to provide a Police Officer as part of the DISTRICT'S Truancy Reduction Program." Unlike the recital, this statement of purpose did not mention providing a police presence on school facilities. The Agreement also provided:

> "3. **Services.** THE CITY will assign one (1) Police Officer to the DISTRICT for Forty (40) hours per week for the term of this contract. The assigned Officer will respond to referrals from the DISTRICT, initiating contacts with parents, students, teachers, individual schools, and their respective staff, maintaining ties with the community agencies and law enforcement. The CITY will also provide a Police Officer for football games and scheduled dances for purposes of security.

> "4. **Target Area.** The target area will be identified and mutually agreed on by the CITY Police Chief and the DISTRICT.[1]

> "5. **Control of Police Personnel.** The Chief of Police will have sole authority for assignment, hours worked, control, and supervision for personnel assigned to the target area. No part of this agreement shall be deemed a restriction on the power of the Chief of Police to keep peace and to utilize Police Officers, or any other employees, or equipment of the Police Department at such times and places and in such manner as the Chief of Police, in the exercise of his judgment and discretion, may deem necessary for the carrying out of the duties of his office.

> [¶] ... [¶]

> "9. **Mutual Indemnity.** The CITY shall indemnify the DISTRICT, its agents, officers, and employees, for liability for injury or death of any person or damage to or loss of any property caused by a negligent or wrongful act or omission occurring in the performance of this Agreement by the CITY, and the DISTRICT shall indemnify the CITY its agents, officers, and employees, for liability for injury or death of any person or damage to or loss of any property caused by a negligent or wrongful act or

---

[1] Chief Whiting answered "[t]hat is correct" when asked if the target area, as agreed to by the District, "meant the high school, continuation, and ROP," that is, the Regional Occupational Program. "Continuation" referred to the Buena Vista continuation school that is affiliated with the District.

4.

omission occurring in the performance of this Agreement by the CITY, [*sic*] its officers, agents or employees."[2]

Paragraphs 6 through 8 of the Agreement addressed financial matters, including the District's obligation to pay costs on a monthly basis. Paragraph 7 stated the total contract price included "routine days off of the full time Police Officer assigned to the target area, including, but not limited to, vacations, sick leave, compensatory time off, holidays and training." It also stated: "The CITY *shall not be required to replace* the assigned Police Officer in the target area during routine periods of absence. DISTRICT shall not be responsible for payment for and the CITY *shall replace* or shall not charge the DISTRICT for said Police Officer for absences that are routine including particularly absence due to industrial injury." (Italics added.)

Paragraph 13 of the Agreement contained the parties' integration clause, which stated in part: "This document contains the entire agreement of the parties relating to the services, rights, obligations, and covenants contained herein and assumed by the parties respectively." Paragraph 17 stated the "Agreement will be construed pursuant to the laws of the State of California." Paragraph 20 obligated the parties to observe and comply with applicable federal, state, and county laws and explicitly incorporated those laws into the Agreement by reference.[3]

At the time relevant to this litigation, Chief Whiting assigned Police Officer Doug Hallmark to the District to perform the terms of the Agreement. During the course of this

---

[2] The City conceded that the last reference to "the CITY" in this clause "should obviously have been in reference to the School District."

[3] The duty to defend and other "obligations set forth in section 2778 … are deemed included in every indemnity agreement unless the parties indicate otherwise." (*Crawford*, *supra*, 44 Cal.4th at p. 553.) Pursuant to this principle and paragraphs 17 and 20 of the Agreement, section 2778 is one of the state laws incorporated into the Agreement. In other words, the Agreement does not express "a contrary intention." (§ 2778.) In particular, the integration clause in paragraph 13 is not a clear expression of the parties' intent to eliminate the duty to defend.

litigation, Hallmark was referred to as an "SRO"—that is, a school resource officer. For example, Hallmark's January 2023 declaration stated he "was the SRO officer for Taft Union High School on January 10, 2013." When asked during the trial if he received training as an SRO, Hallmark stated: "I had training, I had previous training." When asked to explain, Hallmark stated: "Just through POST – POST, police officers standards trainings, and they would give updates."

Hallmark usually arrived at the high school campus at about 7:00 to 7:15 a.m. five days a week and would be there when school started at 7:45 a.m. He testified that generally, he would leave the high school campus around 8:15 to 8:30 a.m. and drive approximately a half mile to the Buena Vista continuation school. Hallmark testified school started there at 9:00 a.m. and, depending on what needed to be done at Buena Vista, he would remain until about 9:30 a.m. and then return to the high school campus, where an administrator would provide him with information about truants or habitually late students.

The testimony of Kim Fields, a campus supervisor, contradicted Hallmark's testimony as to Hallmark's usual location at 9:00. Fields testified he had an established morning routine and he would see Hallmark "on the campus approximately 9 o'clock every single day."

*The Shooting*

On January 10, 2013, a high school student shot his classmate Bowe Cleveland in the stomach with a 12-gauge shotgun near the start of their first period science class at Taft Union High School. Fields testified that, at approximately 8:52 a.m. on the day of the shooting, he had made his regular rounds and was returning to the attendance office in a golf cart when he received a radio call reporting a loud noise in the science building. Fields met his partner, campus supervisor Mary Miller, and they headed towards the science building in the golf cart. About halfway there, they received another report that it sounded like shots were fired. The shooting occurred at about 9:00 a.m.

6.

Fields and Miller went to the science building's second floor and found the shooter in a classroom with the shotgun. Fields talked the shooter into putting the gun down and took him into an adjoining room. When law enforcement officers arrived, they took the shooter away. The shooter later pleaded no contest to the charges against him and was sentenced to a term of 27 years, four months in prison. (*Cleveland*, *supra*, 76 Cal.App.5th at p. 789.)

Hallmark was not at the high school campus when the shooting occurred. Hallmark testified he lived in the mountains in Lockwood Valley about 25 miles from I-5; on the morning of the shooting, he got up at about 5:00 a.m.; around 5:30 a.m., he learned from the television that I-5 was being closed due to snow; he telephoned dispatch around 5:30 to 6:00 a.m. and said he was snowed in and would be responding at the school as soon as the roads were plowed and he could get there. Hallmark also testified he did not recall whether he phoned or texted assistant principal Angelo to tell her he was going to be late. Angelo testified Hallmark did not talk to her by telephone and did not leave a voicemail message that day.

*The Cleveland Action*

Cleveland survived the shooting. In April 2013, he filed a personal injury complaint against the District, superintendent William McDermott, principal Marilyn Brown, and assistant principal Rona Angelo, alleging causes of action for negligence, premises liability based on a dangerous condition of public property, and negligent infliction of emotional distress. Cleveland did not name the City as a defendant. The District and individual defendants filed a cross-complaint against the shooter, his mother, and his older brother. The brother owned the shotgun and ammunition used in the shooting. (*Cleveland*, *supra*, 76 Cal.App.5th at p. 791.)

In a letter dated January 8, 2014, counsel for the District and the defendant employees tendered the defense of the Cleveland action to the City. The letter included a copy of Cleveland's complaint, a copy of the Agreement, and quoted the indemnification

7.

provision in paragraph 9 of the Agreement. On June 3, 2014, the District's counsel sent another letter to the city manager and the City's legal counsel stating no response had been received and again tendering the defense to the City. In a letter dated June 16, 2014, counsel retained by the City informed the attorney representing the District that the tender of defense was "without merit and is hereby rejected." No legal authority or analysis was provided to explain the City's conclusion. The District did not attempt to add the City to the Cleveland litigation as a cross-defendant.

In 2019, a jury trial was held in the Cleveland action. The jury completed a special verdict form asking whether certain employees of the District, the shooter, the shooter's mother, and the shooter's brother were negligent and, if so, whether that negligence was a substantial factor in causing harm to Cleveland. The jury also was asked to assign a percentage of responsibility for Cleveland's harm to those individuals. The jury allocated a total of 54 percent to the following District employees: assistant principal Rona Angelo (27 percent), school psychologist Mark Shoffner (19 percent), superintendent Mark Richardson (4 percent), interim principal Marilyn Brown (3 percent), and campus supervisor Kim Fields (1 percent). The jury allocated the remaining 46 percent of the responsibility to the shooter (27 percent), his mother (10 percent), and his brother (9 percent). (*Cleveland*, *supra*, 76 Cal.App.5th at p. 794.) The special verdict form did not address whether the City or the assigned police officer had any responsibility for Cleveland's injuries.

The jury found Cleveland's past and future noneconomic damages totaled $3.8 million. Based on the jury's findings, the trial court entered a judgment for $2,052,000 against the District based on its employees' negligence. (*Cleveland*, *supra*, 76 Cal.App.5th at p. 794; see Gov. Code, § 815.2 [public entity's vicarious liability for wrongful acts of employees within the scope of their employment].) In March 2022, this court affirmed the judgment against the District. (*Cleveland*, *supra*, 76 Cal.App.5th at p. 782.)

## PROCEEDINGS

The District filed this lawsuit against the City in December 2014, about 21 months after the Cleveland action was filed and 11 and a half months after the District tendered its defense to the City. The operative pleading in this case is the second amended complaint filed by the District in June 2018 (SAC). It stated causes of action for contractual indemnity, equitable indemnity, contribution, tortious performance of contract (negligence), breach of contract, and declaratory relief.

The SAC alleged (1) on the morning of the shooting, the assigned police officer, Doug Hallmark, did not report for work at the high school campus; (2) the officer's absence was without prior approval; (3) the officer's marked police car would have been in a parking spot directly in the line of sight from the shooter's home;[4] and (4) the shooter took advantage of the officer's absence by entering the campus armed with a shotgun and shot Cleveland, his classmate, at close range while Cleveland was seated at a desk during science class. The SAC addressed theories advanced in the Cleveland action by stating Cleveland's complaint alleged the District failed to have a campus police officer present on the campus to ensure the safety and security of the campus and Cleveland actually and reasonably relied on there being an assigned police officer on the premises when he entered. The SAC alleged the City breached the Agreement when an officer did not show up that morning and the City failed to notify the District of this absence.

The subject of the District's damages was addressed by the parties' stipulation that (1) the District was a member of the Self-Insured Schools of California (SISC), an entity consisting of public school districts that pool their resources to address litigation claims,

---

**4** The shooter testified in a 2019 deposition that his house was about two houses away from the high school.

9.

and (2) SISC paid $2,635,974.54 to satisfy the judgment in the Cleveland action and paid $1,414,858.46 in attorney fees and costs in defending the Cleveland action.

*Summary Judgment Motions*

In February 2023, the City and the District each filed a motion for summary judgment or, in the alternative, for summary adjudication. At the April 2023 hearing on the City's motion, the court adopted its tentative ruling and (1) denied summary judgment, (2) granted summary adjudication of the causes of action for equitable indemnity and contribution, (3) eliminated the cause of action for tortious performance of contract (negligence) because it was redundant to the breach of contract cause of action, and (4) denied summary adjudication of the first, fifth and sixth causes of action for contractual indemnity, breach of contract, and declaratory relief.

In May 2023, the court heard argument on the District's motion. Counsel for the District asserted the duty to defend was triggered by the January 8, 2014 letter tendering the District's defense to the City. Counsel argued that, unless it was clear at the time of tender that there was no duty to indemnify, a duty to defend was triggered. In response, counsel for the City argued the court must look to the contract to determine the parties' intentions and there was a significant issue in dispute as to whether the Agreement gave rise to the City's duty to defend the District. The court adopted its tentative ruling and denied the District's motion on the ground the District had failed to demonstrate there were no triable issues of material fact regarding the duty to defend.

*Pretrial Motions and Rulings*

Later in May 2023, the parties filed pretrial motions. The District filed a motion to bifurcate the case by trying the issue of the duty to defend to the court before a jury trial on the issue of the duty to indemnify. The City opposed bifurcation, arguing the trial court already had determined there were triable issues of material fact and a jury should resolve those issues.

On May 30, 2023, the trial court held a final case management conference and ruled on the motion to bifurcate and the parties' motions in limine.  The motions in limine related to the evidentiary issues raised in the District's appeal, and the trial court's rulings on those motions, are described in parts I.B and II.A. of this opinion.

The court denied the motion to bifurcate, which asked for a court trial on the duty to defend before a jury trial on the indemnification claim.  The court stated "that the factual and legal issues presented are so intertwined that bifurcation would not be practicable nor would it be efficient[.]"  As a result, the jury trial of the indemnification claim went first, with the duty to defend claim reserved for the court.

*The Trial's First Phase*

On June 12, 2023, jury selection began.  The next afternoon, the District called its first witness, city manager Jones.  The other witnesses were Chief Whiting, Officer Hallmark, assistant principal Angelo, the property and liability coordinator SISC assigned as its adjustor on the Cleveland action, and campus supervisor Fields.

Portions of the shooter's deposition, which was taken over four years earlier in the Cleveland action, were read to the jury.  The shooter testified a uniformed police officer was routinely at the high school; every time he saw him, the officer was in the administration office; the officer's marked police car was usually parked in the same spot; he would see the car on his way to school if it was parked in its normal spot; he did not recall whether he looked at the area where the police car was normally parked that day; and he could not remember if he gave any thought to where the police officer was the morning of the shooting.  The shooter answered, "I don't know," when asked: "Didn't matter to you that morning, one way or another, that you believed whether there was an armed security person there on campus?"

The trial court's instructions to the jury included the following:

"T[he] District claims it and the City of Taft entered into a contract for law enforcement services to assist with truancy reduction, tardiness, and a

11.

police presence on campus. T[he] District claims City of Taft breached this contract as a result of *a negligent or wrongful act or omission occurring in the performance of this agreement.* T[he] District also claims City of Taft's breach of this contract caused harm to [the] District for which City of Taft should pay.

"City of Taft denies the contract imposed the duties alleged by the [D]istrict. City of Taft also denies [the] District's claim that City of Taft's conduct caused harm to the [D]istrict." (Italics added.)[5]

The trial court then recited the elements the District had to prove under its breach of contract claim and described the parties' dispute about the meaning of the words *law enforcement services*, which appeared in the Agreement's title, and the words *police presence*, which appeared in one of the Agreement's recitals. The court stated the District claimed the words meant the City would provide one police officer for 40 hours per week to intervene and counsel in the District's truancy reduction program *and* provide a police presence on school facilities and, in contrast, the City claimed the words meant the City would provide a police officer as part of the District's truancy reduction program and at football games and school dances for purposes of security. The court next gave standard instructions regarding the interpretation of contracts. (See CACI Nos. 315, 317, 318.)

On the afternoon of June 21, 2023, the trial court read the jury two final instructions relating to their deliberations and went through the three-question verdict form. At 2:33 p.m., the court received a note from the jurors saying they had reached a verdict.

The first question of the verdict form asked: "Did City of Taft breach its contract with the Taft Union High School District?" The jury answered: "No." As a result, the jury did not answer the verdict form's second and third questions about whether the

---

[5] We have italicized the language in this jury instruction that appears in the Agreement's indemnification provision.

breach was a substantial factor in causing damage to the District and the amount of any such damages.

*The Trial's Second Phase*

The second phase of the trial addressed whether the City had a duty to defend the District and was liable for the District's costs of defense. No additional evidence was presented for this phase. Six days after the verdict, the City filed its supplemental brief addressing the District's duty to defend claim. The City argued there was no duty to defend the District in the Cleveland action because the jury verdict clearly defined the scope of the Agreement, which was not intended to provide the high school with a police presence for 40 hours a week. The District's response brief argued the jury verdict did not bar the claim for damages resulting from the failure to defend and its tender provided more than enough information to trigger the City's duty to defend.

In July 2023, the trial court held a hearing on the duty to defend issue and the City's motion for nonsuit that the court had deferred. The court announced its tentative ruling was to find there was no duty to defend and the motion for nonsuit was moot. After hearing argument from counsel, the court took the matters under submission.

Later that July, the trial court issued its statement of decision. The court stated the jury had returned a verdict finding the City did not breach its contract with the District; the contractual duty to indemnify was not triggered without a breach of the contract; "the duty to defend flowed inherently from the duty to indemnify"; and the subject matter of the Cleveland action must be embraced by the contractual duty to indemnify for the duty to defend to activate. The court concluded the allegations in the Cleveland action "were not embraced by the indemnity agreement contained in the Agreement" and, as a result, the City owed no duty to defend the District against the Cleveland action. The court stated it did not believe the parties intended "the City would indemnify and defend the District against the District's own negligence."

13.

<u>*Judgment and Appeal*</u>

On July 31, 2023, the court filed a judgment prepared by counsel for the City. The judgment included the jury's finding that the City did not breach the Agreement. It stated the City "does not owe indemnity to [the] District as a result of the adverse judgment that was rendered against it in *Cleveland v. Taft Union High School District, et al*., Kern County Superior Court Case No. S-1500-CV-279256." Another part of the judgment stated the City "did not owe a duty to defend [the] District in *Cleveland*[.]" The District filed a timely notice of appeal.

## DISCUSSION

The District contends the trial court committed evidentiary error during the jury trial (1) by excluding evidence of Hallmark's statements that he felt guilt and responsibility for the shooting and that he should have been there and (2) by admitting evidence that the District was found liable for negligence by the jury in the Cleveland action. We reject these claims of prejudicial evidentiary error. (See pts. I. & II., *post*.) Consequently, the District is not entitled to a new trial on its claim for indemnification.

The District also contends the trial court erroneously concluded the City had no duty to defend it in the Cleveland action. We agree. (See pt. III., *post*.) The duty to defend was implied by statute into the Agreement and the duty was triggered when the District tendered its defense to the City. (Civ. Code, § 2778, subd. 4.) Consequently, the District is entitled to a new trial on the issue of damages for the breach of the duty to defend.

I.      EXCLUSION OF HALLMARK'S POST INCIDENT STATEMENTS

A.      <u>Evidence Code Section 352</u>

"No evidence is admissible except relevant evidence." (Evid. Code,[6] § 350.) "Relevant evidence" is defined as "evidence, including evidence relevant to the

---

[6] Undesignated statutory references are to the Evidence Code.

14.

credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (§ 210.)  The admissibility of relevant evidence is subject to several statutory exceptions. (§ 351; see §§ 952 [lawyer-client privilege], 1200 [hearsay].)

Here, the exception relied upon by the trial court and the City is set forth in section 352, which provides in full:  "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  Trial courts are vested with very broad discretion in conducting the weighing process and determining whether to admit or exclude evidence.  (*Aguayo v. Crompton & Knowles Corp.* (1986) 183 Cal.App.3d 1032, 1038.)  The weighing process does not involve the application of hard and fast rules but requires the consideration of the particular facts and issues of each case.  (*Phillips v. Honeywell International Inc.* (2017) 9 Cal.App.5th 1061, 1081; *Aguayo*, *supra*, at p. 1038.)

Appellate courts review a trial court's rulings on the admission or exclusion of evidence under section 352 for an abuse of discretion.  (E.g., *People v. Jimenez* (2019) 35 Cal.App.5th 373, 389.)  A trial court abuses its discretion when it rules in an arbitrary, capricious, or patently absurd manner that results in a miscarriage of justice (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10), or when its ruling is outside the bounds of reason under the circumstances (*People v. Johnson* (2022) 12 Cal.5th 544, 605).  " 'A merely debatable ruling cannot be deemed an abuse of discretion.' "  (*Ibid.*)

B.    Proceedings in the Trial Court

The City's motion in limine No. 4 sought to exclude any statements by Hallmark after the incident.  The motion referred to Hallmark's deposition in which he was asked if he ever told anyone he thought that, had he been there that morning, he could have

prevented the shooting. Hallmark answered: "I believe you're referring to the town hall meeting. And I basically stated that if you want to blame somebody, you can blame me for not being there." The City argued this statement was not evidence of fault or culpability, did not go to the issues of breach of contract or the City's obligations under the Agreement, and did not demonstrate the City was negligent. The City asserted the statements "are akin to a post incident apology or expression of remorse which are routinely excluded."

The District's opposition argued Hallmark's statements at the town hall meeting and statements he made to Chief Whiting were admissible as statements of fault. The District asserted the statements were highly probative and, thus, damaging to the City's case, but would not cause "undue prejudice" in the sense that term was used in section 352. The District cited section 1160, which provides that certain expressions of sympathy or benevolence are inadmissible and also states: "A statement of fault … shall not be inadmissible pursuant to this section." (*Id*., subd. (a); see generally, Bartels, *The Stormy Seas of Apologies: California Evidence Code Section 1160 Provides a Safe Harbor for Apologies Made After Accidents* (2000) 28 W. St. U. L. Rev. 141, 145 [before § 1160, apologies usually were admissible through the party admission exception to the hearsay rule, although § 352 gave trial judges discretion to exclude apologies if admission would be unfairly prejudicial].)

At the case management conference held a few weeks before the trial, the court announced its tentative ruling to grant the City's motion to exclude Hallmark's post incident statements. The court described its understanding of Hallmark's statement made at a town hall meeting; expressed its view that the statement alone was not significantly probative given when it was made; and asked the District's counsel whether he was "seeking to introduce that limited statement there." District's counsel replied, "No." The court then stated: "All right. So I will grant defense motion in limine Number 4." The District's counsel then said, "just so we're clear, that deals with … the comment made at

16.

the town hall meeting."  The court asked counsel for the City:  "That's the only statement that I have presented that you're seeking to exclude; is that correct?"  Counsel answered, "Yes, your Honor."

On the third day of testimony, counsel for the District informed the trial court he wanted to question both Chief Whiting and Hallmark about statements Hallmark made to Chief Whiting about feeling guilty and responsible.  The basis for the questions was Chief Whiting's January 2014 deposition where counsel for the District asked Whiting: "What I want to know … is[,] has [Hallmark] explained to you why he feels responsible?"  Chief Whiting answered:  "Yes, because he wasn't there when he should have been there."

The trial court and counsel addressed the request outside the presence of the jury. Counsel for the District asserted Hallmark's statements (1) went to the important factual issue of "whether he should have been there" and (2) were against Hallmark's interests. In response, an attorney representing the City read a larger portion of Chief Whiting's deposition to the judge, asserted the statements were not "some admission that's relevant to the issues in this case," and addressed the impact of admitting the evidence by stating: "It opens … the door to issues of Doug Hallmark's PTSD and survivor's guilt and whether or not he knew about the threat assessment and whether or not his feelings [about] all these things were rightly placed or if all the information he didn't receive from the school district would have made a difference in []his statement."  After hearing the arguments of counsel, the trial court stated:

> "I believe this is a [section] 352 consideration and issue, and at this time I am prepared to rule in that regard.  I do believe there is limited probative value.  I understand[, District's counsel], that you believe this is just a straight admission of culpability.  The court doesn't see it that way.  The court believes that to understand it[,] it would be necessary to give proper context, including some of the other impressions and understandings of Chief Whiting.  Because of that, under 352 I believe that there is substantial potential for prejudice, I think that there's substantial consumption of time

17.

that is unnecessary, and I think that it is possibly and likely to be confusing to the jury. And so under 352 I will exclude the statement."

On appeal, the District contends Hallmark's admissions that he felt guilty and responsible and should have been there the day of the shooting were improperly excluded because (1) the admissions were relevant, (2) the admissions were not prejudicial in their etymological sense and, thus, their probative value was not substantially outweighed by their potentially prejudicial effect, and (3) admitting the evidence would not have necessitated an undue consumption of time or created a substantial danger of undue prejudice, confusing the issues, or misleading the jury. The District asserts the proper appellate relief is to reverse the judgment and remand the case for further proceedings.

### C.     The Court's Ruling Did Not Exceed the Bounds of Reason

The trial court's reasons for excluding Hallmark's statements to Chief Whiting about Hallmark's feelings of guilt or responsibility were (1) a substantial potential for prejudice, (2) an unnecessary consumption of time, and (3) the likelihood of confusing the jury. If any one of these grounds provide an appropriate basis for excluding the evidence of Hallmark's statements, the ruling will be upheld.

Here, we consider the trial court's determination that the probative value of evidence about Hallmark's post incident statements was substantially outweighed by the probability that the admission of those statements would necessitate undue consumption of time and the potential for confusion. (See § 352.) Our evaluation of the trial court's weighing of these factors begins with the relevancy side of the scale.

#### 1.     *Relevance of Hallmark's Statements*

The dispute in this lawsuit centers on the meaning and application of the indemnity provision in paragraph 9 of the Agreement. In that paragraph, the City agreed to indemnify the District "for liability for injury … of any person … caused by a negligent or wrongful act or omission occurring in the performance of this Agreement by the CITY[.]" The District's liability under the Cleveland judgment clearly qualifies as a

"liability for injury … of [a] person" for purposes of the indemnity clause. As a result, the parties' dispute about how the indemnity provision applies to the fact of this case raises three issues: (1) whether there was "a negligent or wrongful act or omission" by City personnel; (2) whether Cleveland's injuries were "caused by" any such act or omission; and (3) whether any such act or omission "occur[ed] in the performance of th[e] Agreement." The District argues, in effect, that Hallmark's post incident statements were relevant to each of these issues.

We begin with the argument about how Hallmark's statements are relevant to the scope of the Agreement, which involves paragraph 9's phrase "occurring in the performance of this Agreement" and the provisions about routine days off or routine periods of absence and a replacement officer. The District's opening brief asserts the statements were admissions against interest "on the critical issue of whether his failure to appear at the High School Campus on the morning of the shooting qualified as a 'routine absence' within the [] Agreement's meaning, or constituted a breach thereof because I-5 was not actually closed at the time." The District quotes a case stating "admissions against interest have a very high credibility value." (*D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 22, citing §§ 1220–1230.) The District's reply brief provides a further explanation of why Hallmark's statements are relevant to determining the Agreement's meaning. It asserts the statements (1) confirmed the City's contractual obligation to provide a police presence on the campus; (2) confirmed Hallmark was principally responsible for performing the City's obligation; and (3) confirmed Hallmark "understood that his presence was required under [the Agreement's] terms at the time [the shooter] came to the campus carrying the shotgun." The reply brief also asserts evidence of the statements was highly relevant because it "would have clarified when Hallmark would have normally been present at the campus and thus support the District's contention as to the meaning of the [] Agreement."

19.

We disagree with the District's assessment of the relevance of Hallmark's post incident statements to the meaning of the Agreement and its requirements. For the statements to have "any tendency in reason to prove or disprove" (§ 210) the parties' mutual intention expressed in the terms of the Agreement, Hallmark would have had to have known the disputed contractual language. There is no evidence in the record, either direct or circumstantial, that Hallmark had this specific knowledge when he made the statements. The evidence shows Hallmark was not involved in the negotiation of the Agreement and had not seen the document before the incident. Chief Whiting told Hallmark about the Agreement and explained the services that Hallmark was to provide under the Agreement. Consequently, Hallmark's understanding of the Agreement was not based on the Agreement itself and could not have reflected the parties' mutual intention when they signed it. (Civ. Code, § 1636 ["contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful"]; Civ. Code, § 1639 [generally, when a contract is written, "the intention of the parties is to be ascertained from the writing alone, if possible"].)

Furthermore, even if Hallmark had a detailed knowledge of the Agreement's terms that reflected the parties' intentions, his statements did not directly reference the Agreement. For example, he did not admit that "I failed to perform the Agreement" or, "if I hadn't breached the Agreement, Cleveland wouldn't have been shot." As a result, for the jury to determine the statements had tended to prove what the Agreement meant, it would have had to infer Hallmark's statements were based on the terms of the Agreement, rather than a general, noncontractual feeling of responsibility. In our view, the inferences that Hallmark's statements were based on the meaning of the Agreement are not particularly strong. In comparison, stronger inferences could be drawn from Hallmark's answers to direct questions from the District's counsel about Hallmark's understanding of his responsibilities as the officer assigned to the District and his routine

20.

in performing his job as the school resource officer. For example, Hallmark testified that he performed his job in uniform, carrying a badge and gun, and using a marked police car, which he parked in a designated spot at the high school. He also testified that, as he understood his duties under the contract, he had to spend time at the high school, which included parking the marked police car, and performing services at a work station in the administration building.

In addition, Hallmark testified about the contractual requirement to provide the District with 40 hours of service per week, which equated to eight hours per day, and his being the officer who provided the 40 hours of service. We recognize the foregoing testimony did not render Hallmark's statements of guilt or responsibility irrelevant under section 210, but that testimony reduced the statements' value in proving what the Agreement required and whether Hallmark failed to perform those requirements.

In sum, Hallmark's statements of guilt and responsibility are weak circumstantial evidence about the Agreement's meaning and far less relevant than (1) the text of the Agreement (see Civ. Code, § 1639); (2) the testimony of the persons who negotiated the Agreement; and (3) the testimony about how the Agreement was actually performed (see *Employers Reinsurance Co. v. Superior Court* (2008) 161 Cal.App.4th 906, 920 [course of performance evidence can be used to interpret an ambiguous contract]). Therefore, the trial court did not act beyond the bounds of reason in determining the evidence about Hallmark's statements of guilt would have "limited probative value" regarding the meaning of the Agreement.

Having considered the relevance of Hallmark's statements to the meaning of the Agreement—that is, how the jury should have interpreted it—we next consider the relevance of the statements to the factual question of whether Hallmark's absence was a

cause of Cleveland's injuries.[7] Stated another way, the disputed issue is whether Hallmark's presence that morning would have prevented Cleveland from being shot. One theory is that the mere presence of Hallmark and his marked police car would have deterred the shooter from coming onto the campus with a gun. Another theory is that Hallmark would have prevented the shooting, which necessarily involves Hallmark interacting with the shooter before the shooting.

The District's reply brief describes a contested factual issue relating to causation as to whether Hallmark would "have been at the school at the approximate time [the shooter] came onto the campus armed with a shotgun." The District asserts Hallmark's admission to Chief Whiting that he felt guilty and should have been there "confirm" Hallmark "believed he would have been at the Taft High School campus when [the shooter] arrived carrying a shotgun" and further believed "that consequently either his presence or ensuing actions could have either deterred or otherwise prevented the shooting from occurring."

First, Hallmark's statements do not explicitly address what Hallmark believed about his location in relation to the shooter's movements. As a result, the statements do not "confirm" the District's allegations about what he believed. Rather than confirming that particular version of what Hallmark believed, the statements can be interpreted in different ways—that is, the statements support different inferences about Hallmark's beliefs when he made the statements. The variety of inferences that are possible reduce the value of the statements in proving Hallmark actually held the beliefs alleged by the District. Second, assuming Hallmark held the claimed beliefs when he made the statements, those beliefs are essentially an opinion by someone who was not there about a

---

[7] The causation issue is embedded in the Agreement's language, which states the City would indemnify the District for liability for personal injuries "*caused by* a negligent or wrongful act or omission occurring in the performance of this Agreement by the CITY[.]" (Italics added.)

hypothetical situation where he was on campus that morning. The hypothetical assumes Hallmark had arrived for work that morning and gone through his normal routine. Regardless of whether Hallmark held the opinion inferred by the District or some other opinion about what would have happened in the hypothetical scenario, it—like all opinions—"is only as good as the facts and reasons on which it is based." (*Bozzi v. Nordstrom, Inc.* (2010) 186 Cal.App.4th 755, 763 (*Bozzi*), citing *Kelley v. Trunk* (1998) 66 Cal.App.4th 519, 523.)

With the foregoing foundation about the uncertainty of the inferences that can be drawn from Hallmark's statements in mind, we return to the theories of relevance—the deterrence and the active prevention theories—for how Hallmark's absence caused Cleveland's injuries. With respect to deterrence, Hallmark's opinion (if held) that his presence, along with the police car, would have deterred the shooter from bringing the gun on campus, has little probative value because it involves the state of mind of the shooter and how the shooter would have reacted in the alternate scenario. Nothing in the record cited by the District supports the inference that Hallmark had any particular insight into the shooter's thought process, either at the time of Hallmark's post incident statements or otherwise. Thus, Hallmark's statements were of little value in proving the shooter would have been deterred by the presence of Hallmark and the police car.

The District's appellate briefs address the active prevention theory of causation and focus on where Hallmark would have been on the campus that morning. This theory necessarily involves Hallmark crossing paths with the shooter before the incident. Hallmark's possible opinion that he would have intercepted the shooter would have little probative value if he did not know the shooter's route and its timing at the time of his statements. This brings us to the other side of the weighing process and, in particular, the undue consumption of time.

23.

## 2.    *Consumption of Time and Confusion*

The trial court addressed two of the consequences of admitting Hallmark's statements by saying it thought "that there's substantial consumption of time that is unnecessary, and I think that it is possibly and likely to be confusing to the jury."  The District disagrees with this assessment, arguing (1) the deposition testimony of Chief Whiting regarding Hallmark's admissions totaled less than two pages; (2) Chief Whiting's belief that Hallmark's statements were made because Hallmark was suffering from "survivor's guilt" and "PTSD" was inadmissible because Chief Whiting was not an expert on the subject and his views were pure speculation; and (3) Whiting's opinions that Hallmark did not have anything he needed to worry about, that Hallmark would not have stopped the shooting, and that Hallmark would have been at the Buena Vista continuation school or elsewhere at the time of the shooting also were inadmissible opinions and speculative.  The District also contends Chief Whiting's testimony would not have been needed at all had Hallmark acknowledged the admissions during his testimony.

The weakness in the District's argument is that it treats Chief Whiting's testimony as the only additional evidence needed to put Hallmark's statements in context.  This focus on additional testimony from Chief Whiting appears related to the trial court's statement that the court did not see Hallmark's statements as a straight admission of culpability and believed that, to understand the statements, "it would be necessary to give proper context, *including* some of the other impressions and understandings of Chief Whiting."  (Italics added.)  The court's use of "including" is not reasonably interpreted to mean the court had determined *only* "other impressions and understandings of Chief Whiting" would be needed to provide proper context.  "Including" indicates that the items that follow are illustrative, not exclusive.  (*Naranjo v. Spectrum Security Services, Inc.* (2024) 15 Cal.5th 1056, 1083.)  In other words, "including" implies the introduction of a partial list, not an exhaustive one.  (*Ibid*.; *Ornelas v. Randolph* (1993) 4 Cal.4th

1095, 1101 [the terms "includes" and "including" are ordinarily words of enlargement and not limitation].)

Accordingly, we conclude the trial court recognized that to provide the proper context for Hallmark's statements, other evidence would have been necessary. This determination is consistent with applicable law because whether Hallmark's opinion (if he has such an opinion) about the active prevention theory of causation had any probative worth was "only as good as the facts and reasons on which it is based." (*Bozzi, supra,* 186 Cal.App.4th at p. 763.) As a result, admitting the statements into evidence would have allowed the City to present evidence about (1) what Hallmark thought he knew at the time of his statements and (2) whether what he thought he knew about the shooter's movements that morning were accurate.

First, we conclude the trial court did not act arbitrarily or exceed the bounds of reason when it determined the presentation of additional evidence about what Hallmark knew, or thought he knew, at the time of the statements would unnecessarily consume time. Second, as to the weighing of probative value against the possibility for confusion, we conclude the court acted within the bounds of reason. In evaluating Hallmark's statements, the jury would have had to interpret Hallmark's ambiguous statements in determining whether his statements reflected his actual belief (i.e., opinion) about the active prevention theory of causation and, if Hallmark actually believed he would have crossed paths with the shooter and prevented Cleveland's injury, whether that opinion was useful in proving that theory of causation. These issues involving Hallmark's thought process had the potential to distract or confuse the jury in deciding the causation issue.

In sum, the trial court did not abuse its discretion when it excluded evidence of Hallmark's statements and avoided a mini-trial on (1) what beliefs were the basis for those statements and (2) their value in proving (a) what the Agreement meant and (b) the contested factual issues. Accordingly, we did not reach the alternate ground for

exclusion, which is raised by the District's contention that the trial court erred in determining Hallmark's statements could result in undue prejudice to the City.

## II. ADMISSION OF EVIDENCE – THE CLEVELAND VERDICT

### A. Proceedings in the Trial Court

#### 1. District's Motion in Limine

The District's motions in limine included a request for an order precluding the City from presenting argument or evidence that the jury's findings in the Cleveland action or our decision in *Cleveland* were binding on the District in this case. The District argued neither the jury verdict nor the *Cleveland* opinion had a claim preclusion or issue preclusion effect because the City was not a party to the Cleveland action; the issues decided in the Cleveland action were irrelevant to the issues raised by the District's claims against the City; and admitting evidence of the findings in the Cleveland action would be prejudicial to the District. The District's motion asserted that, in essence, the City "seeks to argue that the jury in the *Cleveland* matter found District negligent on certain matters, which the appellate court affirmed, and therefore the jury in this case should place all the blame on District."

The City's opposition asserted the Cleveland verdict should be binding on the District on the issue of the negligence of the District's employees in connection with the shooting. To show the relevance of the employee's negligence, the City quoted the mutual indemnification provision's statement that "the DISTRICT shall indemnify the CITY … for liability for injury … caused by a negligent or wrongful act or omission occurring in the performance of this Agreement by the [DISTRICT], its officers, agents, or employees." The opposition did not, however, explain how the employees' negligence was "in the performance of th[e] Agreement" by either the employees or the District.

During the morning session of the final case management conference before the trial, the court heard arguments from counsel on the motion in limine and stated its view

26.

that the District's negligence had already been determined and the current trial was not going to reconsider whether the District's threat assessment had been conducted in a proper manner. The court stated it would grant the District's motion "to the extent that there should be no presentation of evidence regarding the jury findings and/or the appellate opinion unless and until [the District's counsel] opens the door to the presentation of that, and that door could easily be opened, … if you try and argue or present evidence that [the District] somehow acted appropriately in their involvement in the threat assessment that was conducted as it related to [the shooter] and whether or not it was appropriate or inappropriate to include the school resource officer." The court restated its conclusion by saying it did not "believe that it would be relevant to relitigate [the District's] culpability in front of this jury. And so if there's an effort to try to call into question whether or not [the District] conducted itself properly in the time leading up to the shooting, that would open the door for the presentation of the verdict and/or the appellate court findings of substantial evidence supporting the verdict."

After the case management conference's noon recess, counsel for the City asked the trial court to revisit its ruling about the jury verdict and appellate decision in the Cleveland action. He argued the jury's finding the District's employees were negligent was an integral part of the current indemnification dispute (i.e., it was relevant evidence) and proposed a stipulation stating the District had been found negligent and the appellate court upheld the finding. He also argued the findings were relevant to assistant principal Angelo's bias and credibility, particularly in connection with changes in her testimony that counsel characterized as trying to shift responsibility away from her and to the absent police officer or the City.

Counsel and the trial court discussed the issue further and the court stated that information about the verdict would come in if the District argued it was not really negligent and the first jury got it wrong. Counsel for the City stated his concern that the jury would be left uninformed about what happened in the Cleveland action, which could

be confusing or misleading. He again proposed "an agreed upon statement, maybe a preinstruction of –" The trial court then stated it had been going to suggest an instruction addressing some of the concerns and, if the door was opened to presenting the verdict, it would be necessary "to have an instruction for the jury to understand how they can or cannot utilize" information about the verdict. Reiterating its point, the court advised counsel that if the prior jury verdict was admitted for some purpose, "I still believe that it would most likely be necessary for a limiting instruction in that regard."

After further discussion, the court ultimately stated it was "going to maintain my previous order that it is not to be part of the evidence presented or the argument presented" and again advised the District's counsel that "you may have to walk lightly to get through this without opening that door, but that's [] my ruling."

### 2. Opening Statements

During his opening statement, counsel for the District told the jury that on January 10, 2013, a student came to the school late, walking from his house a couple of blocks along the street right in front of the school; the student "walked past a parking spot that is identified as the place where the police officer parks his car in performing his duties as the school resource officer, the car was not there, he walked into the classroom and shot another student." Counsel stated the victim "lived, but as a result of that event the school district got sued and the school district sent a letter to the city asking the city to defend it." Counsel read to the jury allegations from the Cleveland complaint, including the allegations that Cleveland understood the campus had an assigned police officer on the premises, the assigned police officer was not on the premises on January 10, 2013, and, as a result, the shooter was able to enter the premises armed with a gun. Counsel described Hallmark's conduct that morning and his failure to call (1) the officer who routinely acts as his replacement, (2) assistant principal Angelo, or (3) anyone else at the

District. Counsel ended his opening statement by asserting that, as a result of these failures, the evidence would show there was a material breach of the Agreement.

Before counsel for the City began his opening statement, he asked to address the court outside the presence of the jury. The sidebar discussion was held off the record. Based on a subsequent, reported discussion of what occurred during that sidebar, it appears counsel for the City argued the references in the District's opening statement to the police officer's car not being in its parking space opened the door to evidence of the Cleveland verdict and the findings of negligence. The trial court agreed, concluding the door had been opened and counsel for the City could refer to the verdict and the findings. The court, in making a record of what occurred at the sidebar, stated the reference to whether or not a vehicle was parked in the parking space "opened the door to a limited degree" and, at the time, the court did not limit what counsel for the City could go into. The court also stated it ruling was made over District's counsel's ongoing objection.

Counsel for the City began his opening statement by asserting the evidence would show the City was not responsible and did not owe any indemnity or reimbursement to the District. He stated the District was trying to expand the contract beyond what it said and was "simply trying to now get reimbursement for something that their employees were found to be negligent." He referred to the Cleveland action and stated Cleveland and his legal team sued the District, not the City, and the City was not part of that lawsuit. He also stated the jury in the Cleveland action returned a verdict finding the employees of the District, not the City, were negligent and a substantial cause of the loss and the District ultimately paid the damages the jury awarded to Cleveland.

Counsel for the City acknowledged the language in the Agreement stating that the City would indemnify the District and provided "the rest of the story" by reading the jury the last half of the mutual indemnity provision stating the District would indemnify the City for liability caused by the negligence or wrongful act or omission in the performance of the Agreement by the District. Counsel then stated: "We never agreed and nowhere in

29.

this contract does it say that the city agrees to indemnify the school district, reimburse them for their negligence, and the jury specifically found that the school district, independent of the city who wasn't even part of that case, [was] negligent and that negligence lead – was a substantial factor in causing the shooting and the injury to [] Cleveland." Counsel for the City ended his opening statement by saying the evidence would show that the shooting "had nothing, absolutely nothing to do with the City[.]"

### 3. Testimony and Stipulation

The first trial witness called by the District was Jones, the city manager. During cross-examination, counsel for the City asked Jones whether the City was a party to the Cleveland action and, to his knowledge, whether the City was referenced on the verdict form in the Cleveland action. The District objected, asserting there was a lack of foundation and the questions called for hearsay and a legal conclusion. The objections were overruled and Jones answered "no" to both questions.

The next morning, outside the jury's presence, the trial court made a record of a sidebar that included a discussion of the reference to the Cleveland verdict, the jury instruction that nothing the attorneys say is evidence, and the court's concern about "how to actually get the fact that [the Cleveland] verdict was rendered in front of the [jury]." The court stated: "It looks like we have a stipulation that at the appropriate time will be marked as a joint exhibit and will be read to the jury and available to the jury in written form." Counsel for the District stated he still had an issue and requested Jones's testimony of his understanding of the verdict be stricken. Counsel for the City did not agree with the motion to strike.

During the discussion that followed, the trial court described the unreported sidebar held the previous day after the District's opening statement and before the City's opening statement. The court stated it wanted to place on the record the issue about the Cleveland verdict referenced in the City's opening statement. The court mentioned its

30.

ruling on the motion in limine restricting evidence and argument referring to the Cleveland verdict; its concerns at the time that the door might be opened to such evidence and argument; its belief that the District's opening statement "opened the door to a limited degree"; its ruling did not limit what counsel for the City could go into during his opening statement; and counsel's comments to the jury during his opening statement comported with the court's orders. The court then stated to the District's counsel, "that preserves your objections to the – to the comments in opening statements by [the City's counsel] as well as the court's rulings." When the attorneys had nothing to add to the court's description of the unreported sidebar, the court stated: "Now, that led to the court to urge the parties, … off the record, to discuss how the evidence of the [] Cleveland verdict might make it in front of the jury." The court mentioned the discussion of a stipulation, which had been derailed that morning, and invited further discussion from counsel.

The discussion that followed included the issue of parol evidence relating to the negotiations of the Agreement and the issue of getting the Cleveland verdict into evidence. After a break was taken, counsel agreed on the record to a stipulation about the Cleveland verdict.

Later in the trial, the court read the jury the parties' stipulation. It stated "that on July 19, 2019 after the presentation of evidence at trial, a Kern County Superior Court jury rendered an adverse verdict against [] District employees Assistant Principal Rona Angelo, Mark Shoffner, Principal Marilyn Brown, Kim Fields, Mark Richardson, and Superintendent William McDermott in the case of [] Cleveland v. Taft Union High School District, finding that each employee was negligent and that their negligence was a substantial factor in causing injuries to [] Cleveland in that case." A written version of the stipulation was marked as a joint exhibit, admitted into evidence, and made available to the jury during its deliberations.

31.

*4.    The City's Closing Argument*

The District asserts, in connection with its argument that the trial court erred in allowing the introduction of evidence of the Cleveland verdict, that the following part of closing argument by counsel for the City is relevant to establishing the error was prejudicial:

> "This case fails miserably. And to be here to ask the City of Taft to pay millions of dollars because of their negligence – and a prior jury has found the school district employees were negligent. Now, you don't know why that jury concluded that and you're not to assume or speculate why, but the evidence is a prior jury found the individual school district employees, Rona Angelo, Kim Fields, the people that testified here, negligent. City of Taft wasn't sued. No prior jury came in and said the City of Taft did anything wrong."

The District did not object to this argument on the ground that it misstated the record or, alternatively, that it was misleading. Further, the District did not request the jury be admonished or be instructed regarding how it could or could not utilize the information about the Cleveland verdict.

B.    <u>The District's Claim of Trial Court Error</u>

A heading in the District's opening brief asserts the trial court committed prejudicial error in allowing the introduction of the evidence of the Cleveland verdict showing that the District was found liable for negligence. (See Cal. Rules of Court,[8] rule 8.204(a)(1)(B) [brief must state each point under a separate heading or subheading summarizing the point].) The three and a half pages of discussion under this heading do not cite any authority (e.g., constitutional provision, statute, court rule, or published case) to support its contentions that the admission was an error and that the error was prejudicial. For example, the District did not cite a provision of the Evidence Code and

---

[8] Subsequent references to a numbered "Rule" are to the California Rules of Court.

32.

did not cite, as it did in the trial court, case law applying the doctrine of issue preclusion (i.e., collateral estoppel).[9]

Here, we will infer the District is contending the evidence of the jury's verdict was irrelevant or, alternatively, was unduly prejudicial and should have been excluded under section 352. Before addressing relevance and undue prejudice, we consider the City's argument that the District waived or forfeited these arguments by agreeing to the stipulation describing the Cleveland verdict.

### 1. Impact of the Stipulation on the District's Prior Objections

The City's contention that the District forfeited its claim of error is based on the principle that when a party voluntarily enters into a stipulation, he generally is precluded from claiming on appeal that the stipulation is defective. (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1328; see *Baskin v. Hughes Realty, Inc.* (2018) 25 Cal.App.5th 184, 197, fn. 6; e.g., *People v. Flores* (2020) 9 Cal.5th 371, 384 [stipulation to the excusal of jurors forfeits any subsequent objection to their omission from the jury pool].) The City, anticipating that the District would argue its original objections to the admission of this evidence remained in effect, contends the District's decision to subsequently and voluntarily stipulate to the admission of the evidence bars the District "from raising it now." This contention about a stipulation overriding earlier objections that were denied is not supported by a citation to authority.

In *Acosta v. Southern California Rapid Transit Dist.* (1970) 2 Cal.3d 19, our Supreme Court indicated that a stipulation for the admission of evidence after an objection thereto has been denied does not forfeit the objection. (*Id*. at p. 25.) Based on

---

[9] An appellate court may deem an argument forfeited for failure to cite any legal authority or offer legal argument. (*In re Marriage of Kouvabina & Veltman* (2025) 115 Cal.App.5th 293, 302.) Forfeiture is an alternate ground for our conclusion that the District has failed to demonstrate the admission of evidence regarding the Cleveland verdict was error.

*Acosta* and the circumstances of this case, we conclude the District did not forfeit or intentionally relinquish its objection to the admission of evidence about the Cleveland verdict. Thus, the District is not barred from challenging that evidence on appeal. The circumstances of this case that are significant to our conclusion include the fact the trial court expressly stated on the record that the District's objections were preserved before the court urged the parties "to discuss how the evidence of the [] Cleveland verdict might make it in front of this jury" and referring to a stipulation.

### 2. *Relevance and Causation*

The terms of the Agreement have a bearing on the issue of the relevancy of the findings in the Cleveland verdict. Under the mutual indemnity provision, the District and the City agreed to indemnify the other "for liability for injury … caused by a negligent or wrongful act or omission occurring in the performance of this Agreement by the [indemnifying party]." One of the issues arising from the parties' disputes over the meaning and application of the contractual language was the cause or causes of Cleveland's injury. The verdict rendered in the Cleveland action included the jury's findings that District employees were negligent and that negligence was "a substantial factor in causing harm to … Cleveland." As a result, the verdict addressed issues relevant to application of the mutual indemnity provision—specifically, causation and whether the negligence of District employees was among the causes.

There were, of course, issues disputed by the District and the City for which the findings had no relevance. First, the findings did not address whether the negligence of the District's employees or the alleged negligence of the City, "occurr[ed] in the performance of this Agreement by" that party as that phrase was used in the mutual indemnity provision. As a result, the findings were not relevant to those issues and could not be used, one way or the other, in determining them.

34.

Second, the findings did not expressly address whether the City was "negligent" or its conduct was otherwise "wrongful" for purposes of the indemnity provision. Furthermore, the findings that the District's employees had been negligent did not impliedly determine the City was or was not negligent. Thus, the findings were not relevant to the issue of the City's negligence or wrongdoing.

Third, the findings about causation did not fully resolve *all* the causes of Cleveland's injury. As a result, it would have been inappropriate for the jury to infer that any negligence or wrongful conduct by the City could not have caused Cleveland's injury simply because the previous jury found the negligence of the District's employees was among the causes of that injury.

Situations like this, where evidence is relevant for some issues and irrelevant for other issues, are addressed in section 355, which states: "When evidence is admissible … for one purpose and is inadmissible … for another purpose, the court *upon request* shall restrict the evidence to its proper scope and instruct the jury accordingly. (Italics added.) Pursuant to the statutory text, the court's responsibility to give a limiting instruction arises only "upon request." Here, the District has cited nothing in the record showing it requested a limiting instruction.

Based on the foregoing, we conclude the trial court did not err by determining the jury's findings in the Cleveland action were relevant and thus admissible for some purposes. We further conclude the court did not err when it did not give a limiting instruction on its own initiative. (See *Metcalf v. County of San Joaquin* (2008) 42 Cal.4th 1121, 1130–1131 [trial court in a civil case has no duty to instruct on its own motion].) The trial court advised counsel that a limiting instruction might be needed, but it appears no such instruction was proposed by the District.

35.

### 3. *Undue Prejudice*

The District argues the introduction of the Cleveland verdict clearly constituted prejudicial error. The District asserts the emphasis placed on that verdict by City's counsel in his closing argument resulted in substantial prejudice to the District. (See pt. II.A.4., *ante*.) The District cites cases where irrelevant evidence was emphasized during closing arguments resulting in prejudice justifying reversal. (See *People v. Louie* (1984) 158 Cal.App.3d Supp. 28, 50 ["the inadmissible evidence, the prejudicial impact of which was compounded by the prosecution's closing argument, deprived appellant of his right to a fair trial and requires a reversal"].)

The present case is distinguishable from cases where inadmissible evidence was presented to the jury and used in closing argument because, as discussed above, evidence of the jury's findings in the Cleveland action was relevant. As a result, the District's argument is, in effect, that City's counsel made inappropriate use of the jury's findings by implying those findings were circumstantial evidence that the City was not negligent and that the City's conduct did not cause Cleveland's injuries. Counsel for the District, however, did not raise this objection during the closing argument and, thus, did not request that the jury be admonished on how to properly use the jury's findings in resolving the District's indemnification action. Generally, a claim that opposing counsel made inappropriate arguments to the jury will not be considered on appeal "unless the record shows a timely and proper objection and a request that the jury be admonished." (*Horn v. Atchinson, Topeka and Santa Fe Railway Co.* (1964) 61 Cal.2d 602, 610.) In *Horn*, counsel's remarks to the jury created "an atmosphere of bias and prejudice which manifestly was calculated to deprive defendant of a fair trial," yet the Supreme Court concluded the defendant had forfeited its right to complain by its failure to make timely objections. (*Id*. at pp. 609–610.) The rationale for requiring timely objections is that objections give the trial court the opportunity to admonish the jury and forestall the

prejudicial impact, thus avoiding the need for a retrial and the resulting waste of judicial resources. (*Id.* at p. 610.)

Here, we conclude the District's claim that the jury's findings were used in an inappropriate and prejudicial manner was forfeited by the failure to request a limiting instruction on the proper use of those findings and by the failure to object to the City's arguments to the jury that suggested the findings were proof of issues not actually addressed by the previous jury. (See *Sabella v. Southern Pacific Co.* (1969) 70 Cal.2d 311, 319 [relief denied where appellant did not object to inappropriate remarks to jury or request an admonition].)

### 4. *Doctrine of Opening the Door*

The District's appellate briefing discusses the doctrine of opening the door and contends that doctrine did not justify the admission of evidence of the jury's findings in the Cleveland verdict. In particular, the District contends its counsel reasonably and justifiably relied on the trial court's statement as to what would open the door to the admission of the jury's findings and nothing in counsel's opening statement was inconsistent with the court's statements in granting the motion in limine. As result, the District contends the court erred in concluding counsel's opening statement opened the door to the admission of the jury's findings.

"Under the doctrine of 'opening the door,' one party may render otherwise inadmissible evidence admissible by introducing the topic selectively such as to leave a misleading impression. [Citations.] A trial court's ruling on whether rebuttal evidence is admissible on this theory is reviewed for abuse of discretion." (*People v. Kerley* (2018) 23 Cal.App.5th 513, 553.) Here, we conclude the doctrine does not apply to the findings in the Cleveland verdict because those findings were not "otherwise inadmissible." As stated above, the findings were relevant to some of the issues raised and the proper

approach to their irrelevance to other issues was to request a clarifying instruction. (See § 355.)

To summarize, the evidentiary errors the District asserts occurred during the jury trial are rejected. As a result, the District is not entitled to have the jury's verdict vacated and the matter remanded for a new trial on the District's indemnification claim.

III.    DUTY TO DEFEND THE CLEVELAND ACTION

    A.    <u>Basic Legal Principles</u>

        *1.    Indemnification Agreements*

Indemnity refers to "the obligation resting on one party to make good a loss or damage another party has incurred." (*Rossmoor Sanitation, Inc. v. Pylon, Inc.* (1975) 13 Cal.3d 622, 628.) The party obligated to pay another is called the indemnitor. The party entitled to receive the payment from the indemnitor is called the indemnitee. (*Maryland Casualty Co. v. Bailey & Sons, Inc.* (1995) 35 Cal.App.4th 856, 864.) Indemnification agreements ordinarily relate to third party claims—such as Cleveland's tort claims against the District—not direct liability between the parties to the contract. (*Zalkind v. Ceradyne, Inc.* (2011) 194 Cal.App.4th 1010, 1024.)

The Supreme Court has summarized the general principles governing indemnification agreements and the interpretation of such agreements. (See *Crawford, supra,* 44 Cal.4th at pp. 551–553.) Part of that summary states:

> "Parties to a contract, ... may define therein their duties toward one another in the event of a third party claim against one or both arising out of their relationship. Terms of this kind may require one party to indemnify the other, under specified circumstances, for moneys paid or expenses incurred by the latter as a result of such claims. [Citation.] They may also assign one party, pursuant to the contract's language, responsibility for the other's legal defense when a third party claim is made against the latter. [Citation.]

> "As befits the contractual nature of such arrangements, but subject to public policy and established rules of contract interpretation, the parties have great freedom to allocate such responsibilities as they see fit. [Citations.] ... [Citations.] Hence, they may agree that the promisor's indemnity and/or

defense obligations will apply only if the promisor was negligent, or, conversely, even if the promisor was not negligent. [Citations.]

"In general, such an agreement is construed under the same rules as govern the interpretation of other contracts. Effect is to be given to the parties' mutual intent [citation], as ascertained from the contract's language if it is clear and explicit [citation]." (*Crawford*, *supra*, 44 Cal.4th at pp. 551–552, fn. & italics omitted.)

This freedom of contract places the responsibility of defining the nature and extent of the indemnity and defense obligations on the parties to the contract. When this freedom of contract is not exercised and certain points go unaddressed, the gaps created by the omissions are filled by statute. "[Civil Code] section 2778, unchanged since 1872, sets forth general rules for the interpretation of indemnity contracts, 'unless a contrary intention appears.' If not forbidden by other, more specific, statutes, the obligations set forth in section 2778 thus are deemed included in every indemnity agreement unless the parties indicate otherwise." (*Crawford*, *supra*, 44 Cal.4th at p. 553.) Civil Code section 2778 provides in relevant part:

"In the interpretation of a contract of indemnity, the following rules are to be applied, unless a contrary intention appears: [¶] … [¶]

"3. An indemnity against claims, or demands, or liability, expressly, or in other equivalent terms, embraces the costs of defense against such claims, demands, or liability incurred in good faith, and in the exercise of a reasonable discretion;

"4. The person indemnifying is bound, on request of the person indemnified, to defend actions or proceedings brought against the latter in respect to the matters embraced by the indemnity, but the person indemnified has the right to conduct such defenses, if he chooses to do so[.]"

These two subdivisions distinguish the obligation to pay defense costs from the duty to defend on request. Consequently, the Supreme Court has described the duty to defend as distinct and separate from the duty to pay an indemnitee's defense costs after the fact. (*Crawford*, *supra*, 44 Cal.4th at p. 558.) Stated another way, "the duty to

39.

defend upon the indemnitee's request, as set forth in subdivision 4 of [Civil Code] section 2778, is distinct from, *and broader than*, the duty expressed in subdivision 3 of the statute to reimburse an indemnitee's defense costs as part of any indemnity otherwise owed." (*Crawford*, *supra*, at p. 564, italics added.)

> ### 2. *The Duty to Defend*

"[S]ubdivision 4 of [Civil Code] section 2778, by specifying an indemnitor's duty 'to defend' the indemnitee upon the latter's request, places in every indemnity contract, unless the agreement provides otherwise, a duty to assume the indemnitee's defense, if tendered, against all claims 'embraced by the indemnity.' " (*Crawford*, *supra*, 44 Cal.4th at p. 557.) Here, the Agreement did not provide otherwise because it did not explicitly address the duty to defend. Thus, pursuant to subdivision 4 of Civil Code section 2778, the City had a duty to defend the District against all claims "embraced by the indemnity" provision in the Agreement.

The Supreme Court has addressed the meaning of the phrase "embraced by the indemnity" in subdivision 4 of Civil Code section 2778 and given it a broad interpretation. It includes all claims "which, at the time of tender, *allege* facts that would give rise to a duty of indemnity." (*Crawford*, *supra*, 44 Cal.4th at p. 558.) This interpretation reflects the practical reality of when the decision to provide a defense must be made. "[T]he duty to defend arises immediately upon a proper tender of defense by the indemnitee, and thus before the litigation to be defended has determined whether indemnity is actually owed." (*Ibid.*) As a result, the duty to defend "cannot depend on the outcome of that litigation." (*Ibid.*)

Having identified the legal standard that defines when the duty to defend arises, we next describe the principles that establish the duty's duration. In the context of a noninsurance indemnity agreement, the Supreme Court has stated the duty to defend is extinguished if, "during the progress of the third party proceeding against the indemnitee,

all claims *potentially* subject to the contractual indemnity obligation were eliminated, or if the promisor otherwise conclusively established that the claims were not among those 'embraced by the indemnity.'  ([Civ. Code,] § 2778, subd. 4.)"  (*Crawford*, *supra*, 44 Cal.4th at p. 558, fn. 7, italics added.)  " 'When the duty, having arisen, is extinguished by a showing that no claim can in fact be covered, "it is extinguished only prospectively and not retroactively." ' "  (*Centex Homes*, *supra*, 32 Cal.App.5th at p. 1238, quoting *Scottsdale Insurance Co. v. MV Transportation* (2005) 36 Cal.4th 643, 655.)

To summarize, "where the plaintiff's complaint *alleges* facts embraced by the indemnity agreement, the indemnitor has a duty to defend throughout the underlying tort action unless it can conclusively show by undisputed facts that plaintiff's action is not covered by the agreement."  (*Centex Homes*, *supra*, 32 Cal.App.5th at p. 1237, italics added.)

### 3. Case Law Applying Civil Code Section 2778 as Interpreted in *Crawford*

The Supreme Court's determination that an indemnitor has a duty under subdivision 4 of Civil Code section 2778 to defend claims "which, at the time of tender, *allege* facts that would give rise to a duty of indemnity" (*Crawford*, *supra*, 44 Cal.4th at p. 558) has been applied by the Court of Appeal in several published cases.

In *UDC–Universal Development, L.P. v. CH2M Hill* (2010) 181 Cal.App.4th 10 (*UDC*), the third-party action began when a homeowners' association (HOA) sued the developer-general contractor of a condominium complex for construction defects.[10]  The

---

[10] The issue of a duty to defend often arises in the construction context where a subcontractor has agreed to indemnify and defend the general contractor or others for claims related to the subcontractor's work.  (See Riecken, *The Duty to Defend under Non-insurance Indemnity Agreements: Crawford v. Weather Shield Manufacturing, Inc. and its Troubling Consequences for Design Professionals* (2010) 50 Santa Clara L.Rev. 825.)

developer cross-complained for indemnity against numerous subcontractors. In the cross-complaint, the developer tendered its defense of the HOA's action to the subcontractors based on their contracts with the developer. CH2M Hill was one of those subcontractors. (*Id*. at p. 14.) After the developer and all the cross-defendant subcontractors except CH2M Hill settled with the HOA, the developer's claims against CH2M Hill proceeded to trial. (*Id*. at pp. 14–15.) In a special verdict form, the jury specifically found CH2M Hill had not been negligent and had not breached its contract with the developer-indemnitee. (*Id*. at p. 15.)

After the verdict was rendered, the trial court took up the issue of the CH2M Hill's duty to defend. (*UDC*, *supra*, 181 Cal.App.4th at p. 15.) In its contract with the developer, CH2M Hill (1) agreed to indemnify the developer against all claims arising out of or in any way connected with any negligent act or omission by the subcontractor and (2) agreed to defend, upon written request by the developer, any suit or action brought against the developer " '*on any claim or demand covered herein*.' " (*Id*. at pp. 18–19.) CH2M Hill argued the duty to defend did not come into play because there was no finding it had been negligent *and* because the negligence allegations in the complaint did not target or implicate it. (*Id*. at p. 15.) The trial court rejected these arguments and entered a judgment requiring CH2M Hill to reimburse the developer for the defense costs incurred in defending the HOA's claims related to CH2M's subcontracting work. (*Id*. at p. 16.) CH2M Hill appealed, asserting the trial court erred in determining it owed a duty to defend the developer against the HOA's lawsuit. (*Id*. at p. 17.)

On appeal, CH2M Hill argued that, "for a duty to defend to arise, there had to be at least an *allegation* by the HOA that its damages arose at least partially from negligence on the part of [the subcontractor]." (*UDC*, *supra*, 181 Cal.App.4th at p. 19.) "CH2M Hill attempt[ed] to distinguish *Crawford* on the ground … the homeowners [in that case]

42.

expressly alleged negligence by Weather Shield, whereas here the HOA's complaint contained no such allegations of defective performance by CH2M Hill." (*Id*. at p. 20.)

The Sixth District rejected this argument and the attempt to distinguish *Crawford*, stating: "An indemnitee should not have to rely on the plaintiff to name a particular subcontractor or consultant in order to obtain a promised defense by the one the indemnitee believes is responsible for the plaintiff's damages." (*UDC*, *supra*, 181 Cal.App.4th at p. 21.) The court recognized the subcontractor's *indemnity* liability was limited to situations where the subcontractor was proven negligent. In contrast, the court determined the duty to *defend* arose when the cross-complaint attributed responsibility for the HOA's damages to the subcontractor's deficient performance.[11] The court stated: "Although the HOA complaint did not specifically identify each subcontractor or the details of each role in the project, its general description of the defects in the project implicated [the subcontractor's] work. This was sufficient to trigger [its] duty to defend." (*Ibid*.)

The subcontractor also argued the jury's finding that the subcontractor was not negligent rendered the indemnity and defense provisions inapplicable. (*UDC*, *supra*, 181 Cal.App.4th at p. 21.) The Sixth District stated the trial court "properly rejected this position, emphasizing that the indemnity and defense clauses pertained to separate obligations." (*Ibid*.) The trial and appellate courts both recognized that accepting the subcontractor's position "would render meaningless the defense obligation and contravene Civil Code section 2778 and the Supreme Court's admonition that a duty to defend arises out of an indemnity obligation as soon as the litigation commences and

---

[11] The *UDC* court determined service of the developer's cross-complaint initiated the duty to defend because that document contained the developer's tender of its defense against the HOA's action to all cross-defendant subcontractors. (*UDC*, *supra*, 181 Cal.App.4th at p. 14.)

regardless of whether the indemnitor is ultimately found negligent." (*UDC*, *supra*, 181 Cal.App.4th at pp. 21–22.)

The aspects of *UDC* most relevant to the City's duty to defend under subdivision 4 of Civil Code section 2778 are *UDC*'s holdings that the duty to defend could arise even if (1) the third party's complaint against the indemnitee did not name the indemnitor; (2) the third party's complaint did not allege the indemnitor was negligent or engaged in wrongful conduct or specifically mention the indemnitor; and (3) a jury eventually found the indemnitor was not negligent. The court determined the duty to defend arose because the third-party complaint's "general description of the defects in the project implicated CH2M Hill's work." (*UDC*, *supra*, 181 Cal.App.4th at p. 21.)

Another case in which an appellate court addressed an indemnitor's duty to defend involved a city's lawsuit against its former chief administrative officer (Rizzo) for restitution and a criminal action against Rizzo for misappropriation of public funds. (*City of Bell v. Superior Court* (2013) 220 Cal.App.4th 236, 241 (*Bell*).) Rizzo's tender of his defense of the actions to the city was based on provisions in his employment agreement and statutory provisions governing the defense of public entity employees by their employers. (*Id*. at p. 243.) The employment agreement set forth the city's duty to defend and indemnify Rizzo in the same sentence: " 'City shall defend, hold harmless and indemnify Employee against any claim … of any type or kind,' " arising out of any act or failure to act committed within the course and scope of his employment. (*Id*. at pp. 243, 251.) The trial court determined the city was required to defend Rizzo from the time of his tender, regardless of whether Rizzo's act or failure to act was within the course and scope of his employment. (*Id*. at p. 245.) The Second District issued an order to show cause to resolve whether the city had an obligation to indemnify Rizzo and, if not, whether it had an obligation to defend him in the actions. (*Id*. at p. 246.)

In *Bell*, the Second District acknowledged the duty to defend implied in an agreement to indemnify by Civil Code section 2778, subdivision 4 and considered

"whether the duty to defend is dependent upon the scope of the duty to indemnify." (*Bell*, *supra*, 220 Cal.App.4th at pp. 249, 251.) The court concluded: "There is no defense obligation beyond the indemnity obligation; thus, there is no duty for the City to defend any claims which do not, at the time of tender, allege facts which would, *at least potentially*, fall within the scope of the duty to indemnify." (*Id*. at p. 251, italics added.) The court concluded there was no potential for coverage because it was not reasonable to interpret the indemnity provision as including claims made by the city or on its behalf. (*Id*. at p. 252.) The court stated indemnity agreements generally apply to only third party claims and, to encompass claims between the parties to the agreement, there must be clear and explicit language to that effect. (*Ibid*.) The court determined the employment agreement contained no such language and, thus, could not be interpreted as the equivalent of a release from any liability to the city itself. (*Ibid*.) Because the indemnity clause did not apply to claims asserted by or on behalf of the city against the employee, the court concluded the city had no duty to defend Rizzo in either the civil or the criminal action. (*Id*. at p. 253.)

*Centex Homes*, *supra*, 32 Cal.App.5th 1230, like *UDC*, involves a subcontractor's duty to defend a general contractor. The litigation started when an individual sued Southern California Edison and others for injuries sustained when he fell into a utility box with a cover that created an unstable platform. (*Id*. at p. 1233.) The complaint alleged the defendants negligently managed, maintained, and inspected the utility box cover. The plaintiff later added the general contractor for the residential construction project and R-Help Construction Company, Inc. (R-Help), a subcontractor, as Doe defendants.

The general contractor tendered the complaint to R-Help, asking for both a defense and indemnity. When R-Help did not respond, the general contractor filed a cross-complaint against R-Help. (*Centex Homes, supra,* 32 Cal.App.5th at p. 1233.) The trial court determined the question of indemnity was for the jury. (*Id*. at p. 1234.) The

45.

special verdict form asked the jury (1) whether the plaintiff alleged his injuries in whole or in part arose out of or were related to R-Help's work and (2) whether the information available to the general contractor and R-Help at the time of the tender eliminated any reasonable potential that the allegations in the plaintiff's claim arose out of or were related to R-Helps' work. (*Id.* at p. 1235.) The jury answered yes to both questions and judgment was entered in favor of R-Help. The general contractor appealed.

The general contractor argued the trial court erred by delegating the duty to defend issue to the jury because it was a question of law for the court. (*Centex Homes*, *supra*, 32 Cal.App.5th at p. 1235.) Relying on *Crawford*, the appellate court concluded that "[c]laims on which a duty to defend is owed include those which at the time of tender allege facts that would give rise to a duty to indemnify." (*Id.* at p. 1236.) Applying this legal standard to the facts alleged by the plaintiff, the court stated he "claimed his injuries arose out of or related to R-Help's work for [the general contractor]." (*Ibid.*) As a result, it concluded "the trial court was compelled to determine as a matter of law that [the plaintiff's] claim was embraced by the indemnity agreement" and, thus, the duty to defend issue was not a question of fact for the jury. (*Ibid.*) Applying its conclusions to the case's procedural posture, the appellate court determined the trial "court should have instructed that R-Help had a duty to defend and that it breached its duty. The only issue left for the jury would be damages." Accordingly, the court reversed the judgment and remanded for a new trial on the issue of damages resulting from the failure to defend. (*Id.* at p. 1238.)

B.     The City's Duty to Defend

Whether the City had a statutory duty to defend the District depends on whether Cleveland's action against the District was "in respect to the matters embraced by the indemnity" provision in the Agreement. (Civ. Code, § 2778, subd. 4.) Based on the interpretation adopted in the case law, Cleveland's complaint will satisfy this statutory

46.

test if it included claims "which, at the time of tender, *allege* facts that would give rise to a duty of indemnity." (*Crawford*, *supra*, 44 Cal.4th at p. 558; see *Bell*, *supra*, 220 Cal.App.4th at p. 251 ["there is no duty for the City to defend any claims which do not, at the time of tender, allege facts which would, at least potentially, fall within the scope of the duty to indemnify"].)[12] Under this interpretation, a duty to defend can exist even though Cleveland's complaint did not (1) name the City as a defendant or (2) specifically identify the City or the assigned police officer and describe their negligence or other misconduct. (See *UDC*, *supra*, 181 Cal.App.4th at p. 21.) The allegations in Cleveland's complaint will be sufficient to trigger a duty to defend if there is a general description of the wrongs causing Cleveland's injuries that merely *implicated* the City's indemnification obligation under the Agreement. That indemnification obligation pertains to "liability for injury … of any person … caused by a negligent or wrongful act or omission occurring in the performance of this Agreement by the CITY[.]"

Our next steps describe the relevant allegations in Cleveland's complaint and apply the foregoing legal standard to those allegations. The complaint alleged Cleveland was shot by a fellow student on January 10, 2013, during their first period class and the negligent acts of the District, three District employees, and unnamed Doe defendants were the proximate cause of Cleveland's injuries. It also alleged the defendants failed to provide adequate security, protection, and/or take adequate safety measures for the benefit of the students at the high school, including "when Defendants failed to have a Campus Police Officer present on the Taft Union High School campus and/or lock the

---

[12] During oral argument, counsel for the City argued that, when the parties have a written contract, the allegations in the complaint cannot be the controlling factor that triggers the duty to defend. We reject this argument because the precedent established by *Crawford* is binding on this court. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [doctrine of stare decisis].)

exterior fence of the Taft Union High School campus." Cleveland alleged he reasonably relied on there being an assigned police officer on the premises; he entered with the belief that the premises would be free from guns and other prohibited weapons; and at no time was he advised that the assigned campus police officer would not be present.

The issue of causation was addressed in part by the allegations in Cleveland's complaint that on January 10, 2013, "the assigned campus police officer was not on the premises. As a result, an individual armed with [a shotgun] was able to enter upon the Taft Union High School Premises" and the shooter "would not have been able to enter upon the Taft Union High School Premises armed with one or more shotguns … had the assigned police officer been present."

We conclude the foregoing allegations implicate the City's indemnification obligation under the Agreement because (1) that obligation covered liability for injury of any person "caused by a negligent or wrongful act or omission occurring in the performance of th[e] Agreement"; (2) the City agreed in paragraph 3 of the Agreement to assign one police officer to the District for 40 hours per week; (3) the allegations stated the assigned police officer was not on the high school's campus the morning of the shooting; (4) the allegations about the absent police officer identify a potentially "wrongful act or omission occurring the [City's] performance of this Agreement" as that phrase is used in the Agreement's indemnity provision; and (5) the allegations described a causal connection between Cleveland's injuries and the City's potentially wrongful act or omission in performing the Agreement by stating the shooter would not have been able to enter the premises with a shotgun if the assigned police officer had been present.

Consequently, Cleveland's complaint alleged "facts which would, at least potentially, fall within the scope of the duty to indemnify" contained in the Agreement. (*Bell*, *supra*, 220 Cal.App.4th at p. 251.) As a result, the statutory duty to defend was triggered by the allegations in Cleveland's complaint *and* the tender of the District's defense to the City. (See *Crawford*, *supra*, 44 Cal.4th at p. 558 ["the duty [to defend]

48.

arises immediately upon a proper tender of defense by the indemnitee, and thus before the litigation to be defended has determined whether indemnity is actually owed"].) This duty to defend remains in place "throughout the underlying tort action unless it can conclusively show by undisputed facts that plaintiff's action is not covered by the agreement." (*Centex Homes*, *supra*, 32 Cal.App.5th at p. 1237.)

  C. <u>District's Tender of Its Defense to City</u>

  The City contends the District's tenders are tacit admission that the allegations in Cleveland's complaint do not involve matters embraced by the Agreement. In particular, the City argues that we "need look no further than the timing and content of [the District's] tender letters to conclude that there is nothing contained in the *Cleveland* Complaint that would give rise to a duty by the City to defend [the District] or its employees in the *Cleveland* matter."

  The City's tacit admission theory is not supported by legal authority or reasoned argument. (See Rule 8.204(a)(1)(B).) First, the City has not provided authority demonstrating the passage of time (approximately eight months) between the April 30, 2013 filing of Cleveland's complaint and the District's tender letter dated January 8, 2014, has any impact on the City's duty to defend other than delaying the point at which the duty to defend was triggered. Second, the tacit admission theory is directly contradicted rather than supported by the contents of the January 8, 2014 letter. The letter enclosed a copy of Cleveland's complaint, quoted the indemnity provision in the Agreement, stated the attorney's "clients tender the defense to City," and asserted "time is of the essence in the City accepting the tender of this defense." It would be irrational to interpret these statements as an admission that the claims in the Cleveland complaint are not covered by the duty to defend. To the extent that the City's argument implies a proper tender must explicitly identify the source of the duty to defend—which in this case is Civil Code section 2778, subdivision 4 rather than the parties' contractual language—

we reject that implied argument because the City has cited no authority for such a proposition and our independent review has located no statute, case, or other authority requiring that level of specificity in a tender. In short, the tender made by the January 8, 2014 letter was not defective.

### D. Impact of the District's Negligence

The City also makes the sweeping assertion that the District's active negligence precludes *any* duty to defend. The City refers to the findings made by the jury in the Cleveland action that the District's employees were negligent and their negligence was a substantial factor in causing Cleveland's injuries. The City notes the text of the indemnification provision in the Agreement did not require it to defend the District against the District's own negligence. We reject this argument because it is contrary to existing authority.

As described above, the City's duty to defend was implied into the Agreement by operation of law—specifically, Civil Code section 2778, subdivision 4. As a result, the duty to defend existed even though it was not explicitly described in the parties' contract. In this case, the City's duty to defend arose in January 2014, when the District tendered its defense of the Cleveland action to the City. In comparison, the findings in the special verdict in the Cleveland action were made much later, in July 2019. This sequence of events means the City is attempting to use the July 2019 findings to retroactively eliminate a duty to defend that arose approximately five and a half years earlier. Such an attempt violates the principle that the duty to defend, once it has arisen, " ' "is extinguished only prospectively and not retroactively." ' " (*Centex Homes*, *supra*, 32 Cal.App.5th at p. 1238.) The City's appellate brief does not acknowledge this rule against retroactive extinguishment and, thus, provides no explanation or explicit authority for recognizing an exception to the rule against retroactive extinguishment of the duty to defend.

50.

An additional flaw in the City's reliance on the jury's verdict in the Cleveland action to eliminate its duty to defend is that the verdict did not address whether the City was negligent. Therefore, that verdict did not establish that (1) the City was not negligent in the performance of the Agreement or (2) any negligence or wrongdoing by the City was not a cause of Cleveland's injuries. In other words, a finding that the District was negligent does not necessarily imply the City was not negligent. As a result, the verdict did not "conclusively show … that plaintiff's action [wa]s not covered by the agreement." (*Centex Homes*, *supra*, 32 Cal.App.5th at p. 1237.) Based on applicable legal principles, the verdict did not extinguish the duty to defend—either when it was rendered by the jury or when it became final upon the issuance of remittitur in *Cleveland*, *supra*, 76 Cal.App.5th 776. The question of the City's negligence or wrongdoing remained unresolved until the jury in this case decided the issue.

The City relies on *Bryon Jackson Co. v. Woods* (1940) 41 Cal.App.2d 777, which is distinguishable. In that case, the purchaser of a business sued the sellers for *reimbursement* of expenses incurred in defending the underlying action. Our Supreme Court has stated a reimbursement claim is distinct from a claim for damages caused by a breach of the "broader" duty to defend. (*Crawford*, *supra*, 44 Cal.4th at p. 564; see pt. III.A.1., *ante*.) The opinion in *Woods* does not mention the duty to defend, any tender by the purchasers that might have triggered the duty to defend, or Civil Code section 2778, subdivision 4. Thus, *Woods* cannot be interpreted as establishing a principle for the retroactive extinguishment of a duty to defend that has arisen under Civil Code section 2777, subdivision 4 and the parties' indemnification provision.

The City also contends "this Court need look no further than Cal. Civ. Code § 2782(d) which deals with the extent of a subcontractor's duty to defend and indemnify a general contractor for the general contractor's own negligence." That subdivision addresses construction contracts and does not alter how section 2778, subdivision 4 applies to the Agreement. Specifically, it does change when the City's section 2778 duty

51.

to defend was triggered and does not provide for that duty to be extinguished retroactively.

        E.        <u>A New Rule of Law for Mutual Indemnification Agreements</u>

Lastly, we address an argument implied by assertions in the City's appellate brief. The City states that requiring it to undertake the defense of the District would "be contrary to the indemnity agreement itself which is expressed to be *mutual*." This assertion suggests this court should be the first to adopt the following rule of law: When parties have agreed upon mutual indemnification and have not mentioned the duty to defend, the statutory duty to defend is not implied in their agreement. Under this new rule, the interpretation of Civil Code section 2778, subdivision 4 adopted in *Crawford* would not be extended to mutual indemnification agreements.

To the extent the City is asking this court to make new law, we decline the request. First, the point is raised by implication without the development of reasoned argument and the citation to authority, if available. (See *United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 146, 153 [brief must contain reasoned argument and legal authority or the court may treat contention as forfeited]; Rule 8.204(a)(1)(B).) In particular, the City has not identified statutory language that would support the adoption of the new rule of law. Second, the statutory interpretation adopted in *Crawford* has stood for 17 years without being modified by our Supreme Court or the Legislature. This implies that, to the extent implying a duty to defend in a mutual indemnification agreement is contrary to the intention of the parties, the solution is for parties to draft their agreement to state their intention regarding the duty to defend, rather than for the Court of Appeal to adopt a new rule of law.[13]

---

[13] We recognize that applying the principles adopted in *Crawford* to a *mutual* indemnification agreement has the potential to create some situations that the parties may not have expected. (See Riecken, *The Duty to Defend under Non-insurance Indemnity Agreements: Crawford v. Weather Shield Manufacturing, Inc. and its Troubling*

**DISPOSITION**

The judgment is reversed in part and affirmed in part.  The judgment is affirmed insofar as it states the City did not owe indemnity to the District as a result of the judgment rendered against the District in the Cleveland action.  The judgment is reversed to the extent it states the City did not owe a duty to defend the District in the Cleveland action.  The cause is remanded to the trial court for a new trial on the issue of damages for the breach of the duty to defend.

The District shall recover its costs on appeal.  (Rule 8.278(a)(3) [award or denial of costs where a judgment is reversed in part].)

LEVY, J.

WE CONCUR:


DETJEN, Acting P. J.


DE SANTOS, J.

---

*Consequences for Design Professionals*, *supra*, 50 Santa Clara L.Rev. at pp. 847–849 [*Crawford* creates unexpected, uninsured risks in mutual indemnity agreements between design professionals; in the author's view, those harsh consequences can be avoided only if the parties' agreement specifically disclaims any defense duty beyond the reimbursement duty owed under Civ. Code, § 2778, subd. 3].)  We recognize a situation unexpected by the parties to a mutual indemnity agreement might arise if both parties are named as defendants in a plaintiff's complaint and each tenders its defense to the other.  That situation did not occur in this case and, thus, we express no opinion on how the duty to defend applies in such a situation.  If, as a matter of public policy, the Legislature deems it desirable to create special rules for the duty to defend implied by law into mutual indemnification agreements, it is within the Legislature's purview to adjust the statute.  (See *Ruelas v. County of Alameda* (2024) 15 Cal.5th 968, 981.)